# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. TIRZO GARCIA, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) No. 07 C 4860 ) |
| GERARDO ACEVADO, Warden, | ) Judge Rebecca R. Pallmeyer ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

On October 13, 2000, at the conclusion of a bench trial, Judge Vincent Gaughan of the Circuit Court of Cook County, Illinois found Petitioner Tirzo Garcia guilty of first-degree murder, armed violence, and aggravated battery. The court sentenced Garcia to thirty-nine years in prison, and his conviction was affirmed on appeal. After his postconviction appeals were also denied by the state courts, Garcia filed a petition for writ of *habeas corpus* in this court.[1] Garcia's petition identifies five grounds for relief: the unreliability of the trial witnesses' testimony; ineffective assistance of trial counsel; violation of Petitioner's rights under the Vienna Convention; the prosecutor's use of perjured testimony; and prosecutorial misconduct for failing to act with integrity. For the reasons that follow, the court concludes that the petition must be dismissed.

## FACTUAL BACKGROUND[2]

On September 1, 1996, Owen Rodriguez was shot and killed in front of a house at 5310 South Artesian in Chicago, Illinois. Petitioner, a Mexican national, was identified as the shooter and was tried in October 2000 at a bench trial along with codefendant Luis Sanchez. Jason Walker,

---

[1] Petitioner initially named Stephen Wright, the former warden of Hill Correctional Center, as the respondent in this action. Wright has since been replaced by Gerardo Acevado as the warden and the court thus substitutes Acevado as the named respondent. *See* FED. R. CIV. P. 25(d).

[2] Unless otherwise noted, the facts are drawn from the unpublished opinion issued by the Illinois Appeals Court, attached as Exhibit D to Respondent's Answer.

a third codefendant, was tried simultaneously in front of a jury. All three defendants were found guilty for their participation in the murder: Sanchez was convicted of first-degree murder, armed violence, and aggravated battery, and was sentenced to twenty-eight years in prison; Walker was convicted of first-degree murder on an accountability theory and sentenced to thirty-two years; Petitioner was convicted of first-degree murder, armed violence, and aggravated battery and sentenced to thirty-nine years in prison.

Much of Garcia's habeas petition focuses upon the credibility of the witnesses who testified against him. Such a challenge rarely prevails; where a petitioner challenges the sufficiency of the evidence, habeas corpus relief is appropriate only if no rational trier could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). The court nevertheless reviews the testimony here briefly: Baltazar Luna testified that he attended a family gathering at his home on September 1, 1996, and that he was drinking alcohol at the party. At some point, Luna left the party with his uncle, Owen Rodriguez, to get gas for Rodriguez's car. On the way, the car stalled, and the two pushed the car to the side of the street. Luna testified that Petitioner was standing on the corner and asked Luna what he and Rodriguez were doing in the neighborhood. While Luna and Petitioner exchanged profanities, Rodriguez telephoned his wife, Miriam Acevado. Acevado showed up and helped Luna and Rodriguez push the stalled car a couple of blocks to 5310 South Artesian. Petitioner apparently followed them there, and he and Luna began shoving each other. Luna ultimately punched Petitioner in the nose, knocking him down. Petitioner then got up and left. Luna testified that Petitioner was wearing a black hoodie with a white t-shirt and several gold chains.

Martha Ortiz, the victim's niece, testified at trial that she also attended the family gathering and also consumed alcohol. That night, she went to dinner at a restaurant, where Petitioner rang up her order. Ortiz recalled that he was wearing a black hoodie, a white shirt, khaki pants, and a gold chain with a square medallion bearing the inscription, "King of Kings." Around 10:30 p.m. that

2

evening, Ortiz was sitting on the porch of her house at 5310 South Artesian with Luna, Acevado, Carmen Santiago (the victim's sister-in-law) and Mary Rios, a family friend. Ortiz testified that while seated in front of her house, she observed a car approach and saw its lights turn off; shortly thereafter, approximately twenty to twenty-five Hispanic males came towards Ortiz and the others with her. The five individuals who had been sitting on the porch ran inside, but soon afterwards, something was thrown through the window on the front door, prompting Ortiz, Luna, Santiago, and Rios to come back outside. Ortiz recognized Petitioner in the group and observed that he was wearing the same outfit he had been wearing at the restaurant.

An unidentified member of the group of Hispanic males shouted out, "Who hit my uncle?" Luna responded that he did, at which point the unidentified man hit Luna on the head and dragged him into the grass, where a number of the men proceeded to hit him. Although Ortiz had not identified Acevado as one of the persons who emerged from the house after the front window was broken, Ortiz testified that Acevado and Santiago tried to pull the men off of Luna while Rios and Ortiz herself remained on the porch steps. Rodriguez, who had been across the street locking up his car, came running over. Ortiz saw Defendant Walker pull out a gun, and saw Rodriguez struggle with Walker for the gun, which discharged into the air. While this was going on, Ortiz saw a man, dressed in the same clothing Garcia had been wearing earlier, walk around the parked cars towards the struggle between Rodriguez and Walker. Ortiz could not see the man's face because his hood was drawn up, but she saw him pull a gun from his waistband and shout, "I got him. I got him. Move." Ortiz recalled that the man at first pointed the gun towards the ground, but then brought it up towards Rodriguez. As Ortiz turned to go inside the house and call the police, she heard a gun discharge and immediately turned around again in time to see Rodriguez fall to the ground. Ortiz heard other shots coming from a parked station wagon, but she could not identify the shooter. The people assembled on the lawn then ran away from the house.

Carmen Santiago also testified for the prosecution. Santiago, too, stated that she had been

at the family gathering, but testified that she had not been drinking. She testified that she stepped outside when she heard the window break, and saw Petitioner at the end of the porch wearing a black hoodie, a gold square medallion, white shirt, and beige pants. Santiago tried to keep the other men from beating Luna. She observed Garcia coming around the car with something shiny in his hands; although she could not make out his face because his hood was drawn up, she recognized him because his medallion and white shirt were still visible. She heard him say, "I got it. I got it," then heard a shot, and saw "fire coming out of the—blue coming out of the gun." Santiago testified that she was about four or five steps from Petitioner when the gun discharged and that she saw Rodriguez collapse to the ground.

Acevado, the victim's wife, also testified. She stated that she came to help Rodriguez and Luna with the stalled car a little after 9:30 p.m. on September 1, and saw Luna arguing with a short Hispanic male. She urged her nephew, Luna, "Please let's get out of here" and then helped push the stalled car back to the house on Artesian. She then saw the same short Hispanic male waiting for Luna at the corner. She watched the man get into another shoving match with Luna, ending when Luna punched him in the face. Acevado testified that soon afterwards, she was inside the house with other family members when they heard a window shatter. She and the other family members went outside to investigate and saw a group of fifteen to twenty men coming towards the house. The men pulled Luna to the grass and began beating him; Acevado testified that she tried to stop them but was unable to do so and fell backwards into a car. She then saw a short Hispanic man wearing a black hoodie, a white shirt, and light pants run around the station wagon shouting, "I got him. I got him." Acevado recognized this man as the same person she had seen earlier arguing with Luna. As Rodriguez approached the man and Luna, the man turned around and shot Rodriguez.

Mary Rios, the family friend who was sitting with other witnesses on the porch that evening, testified as well. Rios reported that she was outside the house with Luna and Ortiz when she saw

4

approximately twenty to twenty-five men approach the house. Rios recalled standing on top of the stairs with Ortiz while Luna was being beaten. Rios saw a man wearing a black hoodie, dark yellow pants, a white t-shirt, and a chain with a medallion come around a car and walk towards Luna, saying, "I got him. I got him." Rios could not see the man's face because his hood was covering his head. She did see that he at first pointed the gun at Luna, but then turned and pointed it at Rodriguez. As Rios turned to go into the house, she heard a gun shot and turned around to see smoke coming from the man's gun. Rios was about fifteen feet from the shooter when the gun went off.

Finally, Detective Joe Stehlik testified about Petitioner's interrogation. The interview took place on the evening of September 14, 1996, after Petitioner was picked up based on his suspected involvement in the murder. (R. at I70, Ex. M to Ans.) Stehlik stated that he read Petitioner his *Miranda* rights and that Petitioner opted to answer the questions asked by Stehlik and by Assistant State's Attorney Tamara Loury. According to Stehlik, Petitioner told him that he "did not like" the way Luna was looking at him; that Luna struck him in the face; that Petitioner decided to go get some friends and come back to beat up Luna; that Petitioner went back to his mother's restaurant, where he worked, to retrieve a .38-caliber revolver that he claimed was inoperative; and that the Petitioner gave the gun to one of his friends and told him to bury it. The report Stehlik prepared following the interrogation makes no mention of these statements by Petitioner.

Towards the end of the week-long trial, Petitioner's counsel announced:

> Judge, the defense would rest subject to representation to the court that I have talked to my client Tirzo Garcia and indicated to him that he has the option of testifying in this cause or not. I told him only he can make that decision and it was his alone. No one can take that decision away from him. It is my understanding that Tirzo Garcia chooses to remain silent.

(R. at I111:12-19, Ex. M to Ans.) Garcia did not speak up at this point, nor did the judge ask any questions of Garcia or his attorney.

Petitioner was found guilty on October 13, 2000 and, on February 15, 2001, was sentenced

to thirty-nine years in prison. Petitioner appealed, arguing that the eyewitness testimony was insufficient to establish his guilt beyond a reasonable doubt; that he was not informed of his right to contact the Mexican Consulate following his arrest in violation of the Vienna Convention on Consular Relations; and that his trial counsel provided ineffective assistance by not presenting evidence when he argued the Vienna Convention issue. The Illinois Appellate Court, First District, affirmed Petitioner's conviction, and the Illinois Supreme Court denied his Petition for Leave to Appeal (PLA). On February 23, 2004, Petitioner filed a postconviction petition, arguing that his trial counsel refused to allow him to testify and provided ineffective assistance in failing to call certain witnesses at trial and at sentencing. The trial judge denied this petition, and the Illinois Court of Appeals affirmed. Petitioner again filed a PLA with the Illinois Supreme Court, which was again denied.

Garcia now petitions this court for a writ of habeas corpus and has moved for appointment of counsel. Petitioner identified four separate grounds for relief in his petition.[3] First, Petitioner argues that the eyewitness testimony at trial did not establish his guilt beyond a reasonable doubt; second, that his trial counsel provided ineffective assistance by failing to call favorable witnesses at trial and sentencing and by failing to allow Petitioner himself to testify; third, that his rights under the Vienna Convention were violated; finally, that the prosecutor violated his due process rights by knowingly using perjured testimony.

---

[3] Petitioner actually named five grounds, but the last two grounds appear to both allege prosecutorial misconduct arising out of the same circumstances. Specifically, Ground Four states, "The prosecutor knowingly used perjured testimony—or failed to correct known false testimony—to obtain petitioner's conviction. This violated petitioner's right to a Fair Trial, as guaranteed by United States Constitution, and the Fi[f]th and Fourteenth Amendments." (Petition at 13.) Similarly, Ground Five alleges, "Prosecutorial Misconduct depri[ve]d petitioner of his constitutional rights. . . . The State failed to do [its] job with integrity by allowing [itself] to stoop as far down as to make up a d[e]scription of the defendant in order to get a conviction." (*Id.*) The court thus analyzes these two grounds together as one claim of prosecutorial misconduct through the use of perjured testimony.

**DISCUSSION**

**I.      Procedural Default**

When considering a petition for a writ of habeas corpus, a court cannot reach the merits of a claim without considering whether it is procedurally defaulted, "because an unexcused procedural default ends the case." *Williams v. Buss*, 538 F.3d 683, 686 (7th Cir. 2008). A petitioner procedurally defaults his claims when he exhausts his state court remedies without raising the federal claim "at each level of state court review." *Crockett v. Hulick*, 542 F.3d 1183, 1192 (7th Cir. 2008) (quoting *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008)). Put differently, a petitioner must "invok[e] one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If the claim is procedurally defaulted, courts may not review it unless the petitioner can show cause for the default and prejudice resulting from it, or that the court's failure to consider the claim "would result in a fundamental miscarriage of justice." *Crockett*, 542 F.3d at 1193.

Petitioner's claim of prosecutorial misconduct caused by the prosecutor's alleged knowing use of perjured testimony is procedurally defaulted. Even though Petitioner raised it in his PLA to the Illinois Supreme Court, he did not raise it in the prior appeal to the Illinois Appellate Court and thus did not go through "one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. In an attempt to show cause for this failure, Petitioner argues that his appellate counsel provided ineffective assistance in failing to raise the claim. This "cause" is itself procedurally defaulted, though, because he failed to raise this ineffective assistance claim in his state post-conviction proceedings. Comity principles dictate that Petitioner is required to present his claim of ineffective assistance of appellate counsel to the state courts first.[4] *Momient-El v.*

---

[4] Petitioner does not contend that his counsel during his post-conviction proceedings was ineffective in failing to raise the issue of the ineffectiveness of appellate counsel. Even if he did, ineffective assistance of postconviction counsel does not constitute grounds for habeas relief.
(continued...)

*DeTella*, 118 F.3d 535, 541-42 (7th Cir. 1997) (citing *Murray v. Carrier*, 477 U.S. 478 (1986)). Although Petitioner claims that he did so, a review of his brief filed with the state appellate court on postconviction review reveals that he alleged only ineffective assistance of *trial* counsel. (Ex. G to Ans.) Petitioner offers no cause for his failure to raise the ineffective assistance of *appellate* counsel at this stage, therefore his claim that prosecutors suborned perjury is procedurally defaulted.

The court now turns to Petitioner's three remaining claims.

## II. Merits

A court will grant habeas relief on a claim that was not procedurally defaulted only when the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or where the state court decision "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1), (2). A state court decision is contrary to clearly established federal law only if the "state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[, or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Petitioner here makes no such claim. Rather, Petitioner claims that the state courts applied federal law unreasonably; to succeed on such a claim, he must make a showing that "the state court's application of clearly established federal law [is] objectively unreasonable." *Id.* at 408. This standard does not permit the court to overturn a state court decision merely because it is incorrect; the state court's decision must rise to the level of objective unreasonableness before habeas relief is available. *Id.* at 410-11. Additionally, to the extent Petitioner asks this court to overturn factual findings made by the state court, the state court

---

[4](...continued)
*Szabo v. Walls*, 313 F.3d 392, 397 (7th Cir. 2002).

8

findings are "presumed to be correct," a presumption that Petitioner can overcome only with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). With these standards in mind, the court considers the merits of the three remaining grounds for habeas relief.

### A. Vienna Convention

As a Mexican national, Petitioner claims that he was entitled to be notified of his right to contact the Mexican consulate after he was arrested, pursuant to the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820.[5] Respondent argues that this claim is procedurally defaulted. Both parties agree that Petitioner raised the Vienna Convention issue on direct appeal and the state appellate court rejected it. Respondent contends, however, that Petitioner did not raise the issue on his PLA to the Illinois Supreme Court. The court disagrees. Petitioner filed his PLA *pro se* and is entitled to a generous reading of that petition. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) ("That courts are required to give liberal construction to *pro se* pleadings is well established."). In the PLA, Petitioner did assert that his "right to due process was violated by the denial of Petitioner's pretrial motions to suppress his statement." (PLA at 4, Ex. E to Ans.) While Petitioner did not use the exact words "Vienna Convention" here, it is clear that he was referring to it because, on the previous page, he stated that his counsel filed a pretrial motion to suppress "based on a violation of the Vienna Convention on Consular Relations." (*Id.* at 3.) Admittedly, Petitioner did not include this ground in an earlier part of his brief titled "Compelling Reasons for Granting Review," but this is not fatal. Petitioner, a *pro se* litigant, did include a discussion, albeit a brief one, that his rights under the Vienna Convention were violated. Petitioner therefore raised his Vienna Convention claim through one complete round of the state appellate process.

---

[5] In particular, the treaty provides that if a foreign national "so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State" of such detention, and "inform the [detainee] of his right[]" to seek assistance from his native state. Art. 36(1)(b), 21 U.S.T. at 100-01.

9

The claim nevertheless fails on its merits. To the extent there is clearly settled federal law regarding the Vienna Convention, as passed upon by the Supreme Court, it defeats the argument that Petitioner's statements must be suppressed. The Supreme Court has held "that suppression is not an appropriate remedy for a violation of Article 36" of the Vienna Convention. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 337 (2006); *accord United States v. Chaparro-Alcantara*, 226 F.3d 616, 621-22 (7th Cir. 2000). The state appellate court decision in Garcia's case was issued prior to *Sanchez-Llamas* and relied on Illinois law to conclude that suppression was not an available remedy for a Vienna Convention violation. *See People v. Griffith*, 334 Ill. App. 3d 98, 111, 777 N.E.2d 459, 470 (1st Dist. 2002). This conclusion is clearly consistent with, and neither contrary to nor an unreasonable application of, federal law. This ground thus cannot support habeas relief for Petitioner.

### B.  Sufficiency of the Evidence

Petitioner next argues that the eyewitness testimony used to convict him was insufficient and that the state appellate court unreasonably applied federal law in determining that he was proven guilty beyond a reasonable doubt. In particular, Petitioner contends that the eyewitness identifications that supported his guilty plea were inadequate. The state appellate court considered this claim on direct review and concluded that the evidence of the eyewitness testimony was sufficient to sustain the verdict. All parties agree that the relevant standard is provided by *Neil v. Biggers*, 409 U.S. 188 (1972), which holds that the testimony of an eyewitness "can violate a defendant's constitutional right to due process of law when it creates a 'substantial likelihood of irreparable misidentification.'" *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1044 (7th Cir. 2003) (quoting *Neil*, 409 U.S. at 198). This inquiry is a two-step process: first, petitioner must show that the identification procedures were "unduly suggestive." *Gregory-Bey*, 332 F.3d at 1045. Second, the court considers the reliability of the eyewitness identification, based on a totality-of-circumstances test that assesses the following five factors:

10

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil*, 409 U.S. at 199-200.

Petitioner devotes substantial attention to consideration of the five factors, but makes no showing that the identification process, the lineup at which the witnesses identified Petitioner, was unduly suggestive. This failure could itself be sufficient to find against Petitioner. *See United States v. Bowie*, 515 F.2d 3, 8 n.3 (7th Cir. 1975) ("Because we have found that the displays were not impermissibly suggestive, we need not consider the factors set out in *Neil v. Biggers* . . . ."). The state court did not discuss the first element either, though, and proceeded straight to examining the five listed factors. Petitioner is representing himself *pro se* and, given the silence on the issue by the state court, may have been unaware of the requirement to show an unduly suggestive identification process. In any event, if Petitioner cannot show that the witnesses' identifications are unreliable based on the five-factor inquiry, the court need not determine whether he was subjected to an unduly suggestive lineup or showup.

As to the first factor, Petitioner contends that none of the witnesses actually saw him pull the trigger, either because the witnesses had their backs turned or because the shooter was wearing a hood and the witnesses could not see his face. The witnesses did, however, see Petitioner early that night and provided substantially similar descriptions of his clothing, and all identified the shooter as wearing those same clothes. The witnesses had ample opportunity to view the criminal at the time of the shooting. A failure to actually observe the crime itself is not fatal to the eyewitness account if the testimony is still supported by a compelling chain of inferences. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (finder of fact has responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Petitioner next argues that the witnesses could not have been paying close

11

attention because the witnesses had been drinking that night. As the state appellate court observed, however, nothing in the record suggests that "the witnesses were so intoxicated and in a drunken state that their perception and comprehension of the activities that occurred during the shooting were impaired," and their detailed description of that night's events suggest that they were in fact paying a great deal of attention to the circumstances. (Order at 9, Ex. D to Ans.) Petitioner also suggests that the confusion of the moment must have distracted the witnesses' attention, but that is not necessarily true. In fact, it is not unreasonable to believe that the witnesses were all focused upon Luna and Rodriguez at the time of the shooting, because those two were at the center of the fracas. Turning to the third factor, Petitioner ignores that several witnesses identified almost the exact same clothes that he was wearing. He instead focuses on the physical description given by a single witness that the shooter was five feet, eight inches tall and 18-22 years old; Petition in fact is five feet, five inches tall and was 17 years old. This slight discrepancy falls well short of establishing any serious doubt as to Petitioner's identity as the gunman.

The final two factors also favor the reliability of the eyewitness testimony. The fourth factor looks at the level of certainty of the eyewitnesses: Petitioner notes that one witness, Santiago, misidentified a codefendant, but she misidentify Garcia himself and, furthermore, a number of other witnesses expressed confidence that Garcia was the shooter. As the state court noted on direct appeal, "neither Santiago nor Ortiz indicated that they were uncertain of their identification of" Garcia, with Santiago going so far as to say, "I am very positive." (*Id.*) Finally, Petitioner acknowledges that only fourteen days passed between the shooting and the identifications made by Ortiz and Santiago, but nevertheless argues that since the witnesses admitted to discussing the shooting with one another during this time period, their testimony is tainted by this opportunity for collusion. This mere insinuation of collusion without any evidence fails to undermine confidence in the state courts' rulings—the mere fact that a murder victim's family, all of whom witnessed the murder, discussed the incident with one another in the days following the killing does not render

their testimony unreliable. The trial court was able to consider the likelihood of a concocted story as well as other factors affecting witness credibility, and it reasonably concluded that the witnesses' version of events was credible. *See Jackson*, 443 U.S. at 319.

The appellate court did acknowledge some inconsistencies between Detective Stehlik's testimony and his written report, and this court notes that not all of witnesses' accounts of the moments surrounding the shooting were completely consistent.[6] Nevertheless, determining the overall credibility of the witnesses in light of these inconsistencies was the responsibility of the finder of fact. *McFowler v. Jaimet*, 349 F.3d 436, 456 (7th Cir. 2003) ("the credibility and reliability of an eyewitness's in-court identification is a question for the finder of fact"). The trial judge, as the finder of fact, was thus confronted with, on the one hand, some relatively minor discrepancies between eyewitness accounts, and, on the other hand, a core set of facts that all the witnesses appeared to agree upon. Thus, based on the record, the state court did not unreasonably apply the *Neil* factors in determining that the eyewitness testimony was sufficiently reliable to support the trial court's verdict.

### C. Ineffective Assistance of Trial Counsel

To demonstrate ineffective assistance of counsel, a petitioner must show both that counsel's performance was deficient and that he was prejudiced as a result. *Nunez v. United States*, 546 F.3d 450, 453 (7th Cir. 2008). In order to constitute deficient representation, counsel's performance must fall "below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). This is a high hurdle, and courts "indulge a strong presumption" that counsel's performance was reasonable. *Id.* at 689. Petitioner bears the burden of establishing both

---

[6] For example, Acevedo's testimony implied that Luna and the others were inside until the object was thrown the window, while Luna testified that the others started outside, then went inside before the object was thrown through the window. (*Compare* R. at F33:17-F34:4, Ex. M to Ans. *with id.* at F94:9-F95:22.)

13

elements of an ineffective assistance claim.[7]  *Stevens v. McBride*, 489 F.3d 883, 892 (7th Cir. 2007). Garcia claims that his counsel's assistance was unreasonable, causing prejudice, in two primary ways: first, by counsel's refusal to permit him to testify, and second, by counsel's failure to investigate alibi and mitigating witnesses. These claims were both addressed in the state appellate court's postconviction decision, and this court may upset that court's determination that counsel's performance was adequate only if that determination reflected an unreasonable application of federal law.

### 1. Alleged Failure to Allow Petitioner to Testify

Petitioner claims that his trial counsel told him not to testify unless he would say that he acted in self-defense, but since Petitioner maintains that he was not the shooter, he refused to so testify. The state court concluded that Petitioner's claims were "directly contradicted by the record." (Order at 11, Ex. J to Ans.) The appellate court noted that Petitioner's counsel stated during the trial that he had spoken to Garcia about testifying and "told him only he can make that decision and . . . [n]o one can take that decision away from him." (*Id.* at 4.) Defense counsel then stated, "It is my understanding that Tirzo Garcia chooses to remain silent." (*Id.*) Garcia did not say anything at that point to contradict his attorney, and the appellate court concluded that the trial judge was under no obligation to make further inquiry as to whether Garcia was knowingly and voluntarily waiving his right to testify.

While the right to testify in one's defense at a criminal trial is "a fundamental constitutional

---

[7]  In his habeas corpus petition, Petitioner claims that he does not need to establish both elements of an ineffective assistance claim at this stage of the proceedings, but he confuses state and federal standards of postconviction relief. In Illinois postconviction proceedings, a petitioner initially must only present "the gist of a constitutional claim." *People v. Boclair*, 202 Ill. 2d 89, 99-100, 789 N.E.2d 734 (2002) (citation omitted). In a proceeding in federal court under section 2254, however, the petitioner bears the burden of establishing that his claims were contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). Whether the Illinois courts applied too high a standard in assessing his claims under Illinois law is not before the court.

right," *Rock v. Arkansas*, 483 U.S. 44, 53 n.10 (1987), the role of the judge in delineating that right has never been clearly set forth by the United States Supreme Court. Some federal circuits, as well as the State of Illinois, follow the rule that a defendant must speak out at trial to protest his lawyer's refusal to let him testify in order to preserve that right. *See Thompson v. Battaglia*, 458 F.3d 614, 619 (7th Cir. 2006); *People v. Smith*, 176 Ill. 2d 217, 236, 680 N.E.2d 291, 303 (1997). Other jurisdictions require judges to directly question the defendant about his decision to testify. *Thompson*, 458 F.3d at 619. The Seventh Circuit requires more than a "barebones assertion by a defendant" that his lawyer prevented him from testifying. *Id.* (quoting *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991)). Regardless of the Seventh Circuit's rule, though, "[t]he variety in practice among the state courts and the various federal circuits shows . . . that there is no standard clearly established by the Supreme Court of the United States." *Thompson*, 458 F.3d at 619. Without clearly established federal law "as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), Petitioner cannot show that such clearly established law was violated by the state court.

### 2. Failure to Investigate and Call Witnesses

Petitioner claims that he provided his attorney with the names of five alibi witnesses and five mitigating witnesses for the sentencing portion of the trial, but that his attorney did not call any of those witnesses and did not even investigate the potential testimony of the mitigating witnesses. The state appellate court essentially analyzed this claim as two separate claims: failure to call trial witnesses and failure to investigate and call sentencing witnesses.[8]

The state appellate court concluded that Petitioner could not show any prejudice resulting

---

[8] In the petition he filed in this court, Petitioner also claimed that his counsel was ineffective for failing to investigate the five trial witnesses as well. The court has no need to consider this claim, however, because he did not present it in the state postconviction proceeding and it is therefore procedurally defaulted. Even if it were not defaulted, the court doubts that the analysis of that claim would differ from his claim, properly presented in state court, that his counsel failed to investigate witnesses for sentencing.

from the failure to call the witnesses identified by Petitioner. Petitioner provided this court with affidavits from two of the potential witnesses, Celerina Garcia (his mother) and Micaela Sandoval. Both would have testified that Petitioner was wearing different clothes than the state's eyewitnesses claimed they saw him wearing on the night in question. Additionally, Sandoval would have testified that Garcia did not possess a gun that night. The court found these potential witnesses unconvincing. The court found Celerina's testimony unconvincing because the basis of her purported knowledge that Garcia wore black pants and a white shirt at the restaurant that day was the fact that those were the colors people always wore at the restaurant. (Order at 14, Ex. J to Ans.) Furthermore, the court determined that Sandoval's credibility was damaged by her assertion that Garcia did not possess a gun that night, even though he admitted that he had a gun that evening. (*Id.*) In his habeas petition, Petitioner did not provide the substance of the testimony of the other witnesses. He did present that evidence in the state court (albeit without submitting affidavits from those three witnesses), but the appellate court found them unconvincing as they did not "remotely" relate to the clothing Garcia wore the night of the murders. (*Id.* at 15.) The court thus concluded that trial counsel's failure to call any of these five witnesses would not have altered the outcome of the trial and therefore caused petitioner no prejudice.

    None of the state court's conclusions are unreasonable applications of clearly established federal law. Petitioner bears the burden of showing that a reasonable probability exists that the outcome of the trial would have been different but for counsel's errors. *See Hardamon v. United States*, 319 F.3d 943, 948 (7th Cir. 2003). The court evaluated the probative value of the potential testimony of Petitioner's witnesses and reasonably determined that it was not strong enough to counter the overwhelming evidence of his guilt presented at trial. The state court reached this conclusion even without noting the marginal value of the proposed testimony of defendant's mother, which is subject to challenge on the basis of bias. *See Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995) ("As a matter of trial strategy, counsel could well decide not to call family

16

members as witnesses because family members can be easily impeached for bias."). Additionally, none of these conclusions were "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). Petitioner asserts that, contrary to the appellate court's contention, he never admitted to having a gun. The record suggests otherwise, however; although he did not make a note of it in his report, Detective Stehlik testified at trial that Garcia told him that he returned to the restaurant prior to the shooting and retrieved a .38 caliber pistol, and the trial judge was entitled to believe this testimony. (R. at I74, Ex. M to Ans.) Petitioner's claim of ineffective assistance based on his counsel's failure to call additional trial witnesses therefore fails.

Petitioner also claims that his counsel provided ineffective assistance by failing to investigate and call mitigating witnesses at his sentencing. Attorneys owe their clients "a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Washington v. Smith*, 219 F.3d 620, 631 (7th Cir. 2000) (quoting *Strickland*, 466 U.S. at 691). Petitioner claims that he provided his attorney with the names of five witnesses he could call at sentencing, but that his attorney did not even investigate what these witnesses had to say. Furthermore, Petitioner claims that his counsel did subpoena one of those five individuals, Leroy Walker, but issued the subpoena for the wrong day; as a result, no mitigating witnesses appeared at Garcia's sentencing. The state court rejected Petitioner's claim that this constituted ineffective assistance because he did not provide any evidence regarding the substance of these witnesses' testimony in the form of affidavits or otherwise. Under Illinois law, a postconviction petition "*shall* have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (emphasis added). On this basis, the court concluded that it had no way of determining whether the testimony that those five witnesses would have offered would have resulted in a lower sentence for Petitioner.[9]

---

[9] The court also rejected Petitioner's argument that this failure should be excused (continued...)

The state court therefore failed to consider whether counsel's performance at sentencing constituted ineffective assistance because Petitioner failed to follow the requisite procedures. Although one might reasonably think that the state court reached the merits and concluded that the failure to include affidavits showed that Petitioner had not established prejudice, the February 23, 2009 state court did not even use the words "cause" or "prejudice" in its analysis of Petitioner's claim. Therefore, this court may not address the merits of Petitioner's claim because the state court's decision rests on independent and adequate state grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (state court's refusal to address petitioner's claim on procedural grounds constitutes independent and adequate state grounds). The court nevertheless notes that even if the state court had reached the merits of Petitioner's claim, the standard applied by the state appellate court is entirely consistent with federal law that governs when a petitioner fails to explain what mitigating evidence would have presented. *See Hardamon*, 319 F.3d at 951 (petitioner "has the burden of providing the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced." (quoting *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133 (7th Cir. 1990) (internal quotations omitted))). Therefore, Petitioner's claim that his trial counsel provided ineffective assistance at his sentencing by failing to investigate mitigating witnesses cannot afford the basis of habeas relief.

## **CONCLUSION**

Petitioner Tirzo Garcia's petition for a writ of habeas corpus [1] is denied. Petitioner's motion for appointment of counsel [20] is denied as moot.

ENTER:

*[signature: Rebecca R. Pallmeyer]*

---

[9](...continued)
because mitigating witnesses at sentencing would obviously provide testimony of the defendant's good character.

Dated: March 4, 2009

_____
REBECCA R. PALLMEYER
United States District Judge